MILLER *v.* YATES.

Opinion delivered October 18, 1926.

1. PARTNERSHIP—PAYMENT BY PARTNER OF INDIVIDUAL DEBTS.—Where a partner sells merchandise, and charges the purchase price against his personal obligation to the purchaser, without his copartner's consent, the latter, after purchasing the business, including accounts, may recover therefor against such purchaser.

2. PARTNERSHIP—AUTHORITY OF PARTNER TO PAY INDIVIDUAL DEBTS.— Where a partner without objection permits his copartner to sell partnership merchandise, and credit the price on his personal obligation, he cannot, after purchasing the partnership and outstanding accounts, recover from the buyer.

3. PARTNERSHIP—JURY QUESTION.—Evidence *held* to make it a jury question whether a partner assented to his copartner crediting the price of goods sold to defendant upon his copartner's obligation to defendant.

Appeal from Columbia Circuit Court; *L. S. Britt,* Judge; affirmed.

*Kitchens & Upton,* for appellant.

*McKay & Smith,* for appellee.

WOOD, J.   O. E. Yates instituted this action against N. B. Miller. Yates alleged that he and J. H. Roden were engaged as partners in the grocery business in the city of Magnolia, Arkansas, between the first of April and the sixth of August, 1924; that the plaintiff purchased Roden's interest in the business, including all the outstanding accounts; that, while the plaintiff and Roden were in business as partners, Roden sold to N. B. Miller goods, wares and merchandise belonging to the partnership of the value of $392.26, and, without the knowledge or consent of the plaintiff, charged the amount of such sale to himself in order to pay a personal indebtedness due by Roden *to* Miller. The plaintiff prayed judgment against Miller in the sum of $392.26.

Miller answered, and admitted all the allegations of the complaint, except that Roden charged to himself, without the knowledge or consent of plaintiff, the purchase price of the goods, wares and merchandise which

the defendant purchased of Roden. Miller denied that he was indebted to the plaintiff in any sum.

The plaintiff, Yates, testified that he and Roden were in business as partners under the name of Roden & Yates. Witness did not know of, or authorize Roden to charge, the account which is. the foundation of this action to himself and obtain credit with Miller on the individual indebtedness which Roden was due Miller. Witness was originally in partnership with Miller, and the business was known as Miller & Yates. Witness purchased Miller's interest, and took Roden in, who was to own one-half of the business. Witness did not know that Roden had been letting Miller have merchandise and charging same to Roden to settle Roden's individual indebtedness with Miller, until about the time or right after witness came into possession of the business. Witness did not know that Roden owed Miller until a while before witness bought Roden's interest. Witness ascertained that Roden had charged Miller's account to Roden when witness started to examine the books. Witness was fixing to buy Roden out when he discovered this. The bookkeeper was Wiley Langston. There was still $150 on the books charged to Miller at the time witness bought the interest of Roden.

Witness Coney testified that he was collecting for Yates about the time Roden retired from the business, and he presented an account against Miller in the sum of $150, which Miller refused to pay, saying that it had been credited to Roden's note.

Roden testified that he was in partnership with Yates and Miller in the original firm of Roden, Miller & Yates. Yates and witness bought out Miller's interest. Witness gave Miller a check for $2,300 and credited him on the books of Roden & Yates in the sum of $100. Yates, Miller and witness were present at the time of this transaction. The $100 credited on Miller's account was the amount that he owed the firm of Miller & Roden & Yates at that time. Witness had borrowed $650 from Miller to cover part of witness' stock in the firm of Roden,

Miller & Yates, and witness asked Miller if he wanted what witness owed him at that time, and Miller replied, "No." Witness said to Miller, "I would be glad for you to trade here, and I will charge that to myself and credit you for it," and Miller replied, "Well, I have to trade somewhere, and that will suit me as well as anything." Yates was there in the house, but witness does not know whether he heard this conversation or not. Witness thought Yates was close up. The three of them were talking together when witness made that statement. The conversation occurred just after the witness and Yates had bought Miller out. The matter of crediting Miller's account on witness' individual account came up between Yates and witness about a week or ten days after the above conversation and transaction, when Miller brought a new note for $500 for witness to sign and for witness to charge to himself the sum of $150 principal of the note and interest to date, which would make it $189. Witness explained that to Yates, and asked him to sign the new note to Miller with witness. Yates refused to do so. Witness said, in the conversation with Yates, that he would charge the $189 to witness' personal account, and credit Miller's account. Witness was asked if Yates made any objection to this, and answered, "He didn't say yes or no." The arrangement witness had with Miller was as follows: "I gave Miller credit on the books of Roden & Yates for $189, and charged myself with it, and Mr. Miller credited me on the note with it, and then on the first of each month we made similar entries for whatever the amount his account was." The next time that the matter came to Yates' knowledge must have been about the first of August, about the time witness and Yates were dissolved. Along about the first of July Mrs. Miller came in and bought a bill of dry-goods and groceries amounting to about $40 or $45, and witness told Yates about it. Witness concludes his testimony in chief as follows: "I balanced Miller's account and debited my account with the amount of his on the company books two or three times, I don't remember

exactly. As a showing for this, Miller was given a credit slip from to time. Miller held my note and was to credit the amounts of these credits that went to Miller's account on the note. That was the agreement between us. I do not know whether or not Yates knew of these arrangements from either the time Miller withdrew or this other time that I spoke of, when the $500 note was presented, or at the time we settled with him (Miller), no more than I have already told you. I know that I talked with him about it, just what I have told you.'' On cross-examination witness stated that he and Yates dissolved partnership in August or the first part of September—witness did not remember the exact date. He thought it was about the first of September, 1924.

The defendant, Miller, testified in his own behalf, and, according to his testimony, he sold out his interest to Roden and Yates about May 1, and the trade was finally consummated on May 9. At that time Roden owed witness the sum of $650, money which witness had loaned Roden to put in the business of Roden, Miller & Yates. Roden asked if witness wanted the money he owed witness, and witness replied that he could do without it, as money at that time was hard. Roden then asked if it would suit witness to trade at the store, and let Roden pay him that way, that is, to credit witness and charge the amount to Roden. Witness agreed to that. Roden told witness he would charge it to witness until the end of the month, and then Roden would charge it off to his individual account and give witness credit for it. This was in Yates' presence and was a part of the conversation that took place at the time of the settlement. Witness first received a bill for this account when it was presented to him last fall, just a few days before circuit court—the November term of court. That was the first time witness knew that Yates was denying the arrangement witness had for collecting that account. Witness further testified that he did not remember whether there was anything said between witness and Roden in regard to witness' individual indebtedness until witness sold out

to them or not.   Yates knew Roden owed witness money, because witness asked Yates to sign the note, and he said he would rather not do it.   Witness did not remember just when Yates was asked to sign the note.   Yates was present and heard Roden ask witness if witness wanted the money Roden owed witness at the time they paid for witness' interest.   Roden, Yates and witness were there at the office in the store at the time.   The office is small— about six by eight.

Vesper Holly testified that he was employed by Roden & Yates from the first of May to some time in August, when Roden sold out to Yates.   He heard Roden and Yates talk about Roden balancing Miller's account and charging it to Roden.   He could not remember just the time he heard this.   He heard them talk about it a few days after they bought Miller out.   They were talking about this money Miller had loaned Roden, and Roden asked Miller if he wanted this money, and Miller told him he would trade it out, as he needed the stuff.   Later the witness heard Yates and Roden talking about the accounts.   The collections were a little slow, and they were talking about what Miller had bought making the payment of these bills a little hard.   Roden was talking to Yates about it.   Witness heard them talking about a bill of goods Mrs. Miller had bought there.   Roden was talking about them buying that much and getting no money for it.   This was some time before Roden and Yates dissolved partnership.   Roden and witness were running the business.   Yates would help them in the store on Saturdays.

On redirect examination, Yates testified that nothing was said between Roden and Miller in witness' presence or hearing when witness settled with Miller as to how they should handle the account of Miller.   Nothing was said to witness when Roden presented that note and asked witness to sign it about the way they were going to handle Miller's account, and that was the first witness knew anything about the note.   Witness did not know a thing about Roden having given Miller credit on the books

for $189 until the bookkeeper found it. Witness did not work in there during the time witness and Roden were partners, except on Saturdays, and witness did not know anything about the way Roden was handling the business. Sometimes witness would drive in through the week and spend an hour or so, and would sell something if witness was needed. Witness had access to the books. Witness trusted them, and did not suspect them. He had farmed all of his life, and was farming at the time, and did not come in except on Saturdays.

At the request of the plaintiff the court instructed the jury as follows: "You are instructed that, if you believe from a preponderance of the testimony that J. H. Roden sold goods, wares and merchandise to the defendant, and that said Roden charged said goods to the said defendant, and at the first of each month canceled the debt in order to discharge a personal obligation due by the said Roden to the said defendant, without the assent of the plaintiff, then you will find for the plaintiff."

At the request of the defendant the court instructed the jury as follows: "You are instructed that partnership property may be disposed of to pay the individual debts of a copartner with the consent, either express or implied, of the other copartner, and, if you find from the evidence in this case that the plaintiff, O. E. Yates, knew of the transactions complained of at the time, or assented thereto, or that he later acquired knowledge thereof and failed to clearly and promptly repudiate them within a reasonable time after they came to his knowledge, he will be deemed to have ratified them, and will be bound thereby as though he had expressly authorized them in the first instance."

The jury returned a verdict in favor of the plaintiff in the sum of $392.26. Judgment was entered for the plaintiff in that sum, from which is this appeal.

The law applicable to the facts, which the testimony for the respective parties tended to prove, was correctly declared by the trial court in its instructions to the jury. *Boyd* v. *Arnold,* 103 Ark. 105, 146 S. W. 118; *Smith* v.

*Spinnenweber,* 114 Ark. 384, 170 S. W. 84. Counsel for appellant contend that this court should declare as a matter of law that appellee knew of the arrangement between Roden and appellant Miller whereby Miller was to trade at the store of Roden & Yates and receive credit on his account at the end of each month for the amount thereof, which amounts were to be charged to Roden's individual account on the books of the firm of Roden & Yates and credited on Roden's note held by Miller. We cannot agree with counsel in this contention. It occurs to us that the above issue, under the evidence, was purely one of fact. The material testimony bearing on the issue is set forth above, and it speaks for itself. No useful purpose could be subserved by discussing it. The appellee testified in substance that he did not know of the arrangement between Roden and Miller until about the time, or right about the time, he came into possession of the business himself, and he did not know that Roden owed Miller anything until a while before appellee bought Roden out. Appellee was asked this question: "How came you to find out that Mr. Roden had done this—had charged this account up to himself?" His answer was, "When I started to go into the books, Mr. Willie Harrington was attending to the books. I was just fixing to buy Mr. Roden out, and that was the time Mr. Harrington found this." This testimony of the appellee was of itself sufficient to make an issue of fact for the jury as to whether appellee had knowledge of the arrangement between Roden and Miller, as above stated by counsel for the appellant. To be sure, there was a sharp conflict on this issue of fact, but the jury were the sole judges of the credibility of the witnesses and the weight to be given their testimony, and it cannot be said as a matter of law that there was no testimony of a substantial character to sustain their verdict. The judgment must therefore be affirmed.